# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

CHARLES TINSLEY STEWART                                    PLAINTIFF

V.                                                  NO. 3:08CV-00272-JDM

ABSO, INC., et al.                                         DEFENDANT

## <u>MEMORANDUM OPINION</u>

The defendants have filed motions for summary judgment in this action (docket nos. 24 and 25). Having considered the motions, being otherwise sufficiently advised, and for the reasons stated more fully below, the court will grant the defendants' motions for summary judgment.

## I.

Charles Tinsley Stewart, M.D., applied and interviewed for the position of Associate Medical Director for the Hosparus, Inc., inpatient unit at Baptist Hospital Northeast, in LaGrange, Kentucky, in April and May of 2007. He was not offered the job and asserts that he was wrongfully denied that employment because of an error in a background report prepared for Hosparus by an outside contractor, Abso, Inc. He seeks recovery of compensatory and punitive damages under the Fair Credit Reporting Act, 16 U.S.C. § 1681 *et seq.*, and for two state law torts: defamation and wrongful interference with a business expectation.

### *Dr. Stewart's Background*

Dr. Stewart's personal and professional history at the time he applied for the job with Hosparus was broad and varied. In addition to his medical degree and the license to practice he holds in Kentucky, he holds three Masters of Arts, including one in communications from the

University of Missouri, one in religion from the Louisville Presbyterian Seminary and one in spirituality from Bellarmine University. He has completed a year of graduate study of theology at Cambridge University in England. He is Board Certified with the American Board of Physical Medicine and Rehabilitation, and is a certified independent medical examiner. He has taken steps to become a permanent deacon in his church and hopes to become ordained as an Episcopal priest in the future. He has also published numerous articles and studies in medical journals, although most appear to have been published before the mid-1990s, none recently. He has also served in communications positions for two governors of Kentucky.

His practice of medicine, however, has waxed and waned over the years, because he repeatedly has battled both alcohol and drug addiction, with the latter leading to the suspension of his medical license in Kentucky for approximately four years from 2000 to 2004. Mr. Stewart first suffered from alcoholism in 1974, three years before he began medical school. He apparently completed medical school in 1981 without incident, but relapsed in 1986, not long after he began his private practice focusing on rehabilitation and pain management.

His most recent battle with addiction (and the one most significant for this case) occurred in 1999 when, following a painful operation, he became addicted to prescription medications. In November of that year, he was stopped by agents of the Louisville Metro Police and the Drug Enforcement Agency, and found to be in possession of an unlabeled vial containing Percocet, Lortab, and Xanax – all controlled substances. The agents' investigation also revealed that Dr. Stewart had been engaged in prescription splitting with his patients and had improperly left

signed, but blank, prescription sheets with his nurse for her to dispense in his absence.[1]  He was originally charged with one felony (possession of non-narcotic substances in the second degree, second or greater offense) and three misdemeanors pertaining to the possession of controlled substances.  Following negotiations by his counsel and what appears to be the intervening surrender and later return of his medical license with significant restrictions, he subsequently pled guilty to a single, lesser misdemeanor charge on March 9, 2000,[2] and his felony and remaining misdemeanor charges were dismissed at that time.

Dr. Stewart's medical license was not fully restored until 2004.  When it was, he resumed his private practice to a very limited extent while pursuing two masters degrees, a deaconate at his church, and spending a year studying at Cambridge University.  These activities, while wholly admirable, are not the full time practice of medicine, although they arguably would be a helpful educational adjunct for a doctor contemplating a shift in practice to palliative care.  There is no evidence in the record, however, that Dr. Stewart actively contemplated such a shift until he applied for the employment at issue in this case.

---

[1]In his pleadings, Dr. Stewart does not deny these facts, but repeatedly omits any reference to prescription splitting or the blank signed scripts, and states only that he stored his lawfully-prescribed medications in an unlabeled container.  Whether this is denial from a psychological perspective, is not the court's place to say.  Dr. Stewart's failure to object to, or refute, the defendants' recitation of these facts is admission for the purpose of judicial determination, however.

[2]It appears from the record submitted to Abso by the Administrative Office of Kentucky's courts that Dr. Stewart may have pled guilty on March 9, 2000, to one of his original misdemeanor charges, specifically possession of controlled substances in the third degree (first offense), but that plea was set aside on February 6, 2004 (as indicated by the notation "SAP"), and a guilty plea regarding an amended charge of possession of controlled substances not in their original container entered in its in its place.  For whatever reason, Dr. Stewart has not provided the court with the full detail of his criminal case.  This is perplexing, as one of his major contentions against Abso is that Abso provided an evaluation of his criminal history without conducting a detailed review of original criminal court records.  Whether this omission was strategic, the court cannot say, but the record is nonetheless sufficient to permit a ruling on the defendants' summary judgment motions.

*Dr. Stewart's Application for Employment with Hosparus*

The year after Dr. Stewart returned from Cambridge, an acquaintance in one of his graduate classes mentioned the assistant medical director position available at Hosparus, Inc., a non-profit organization serving terminally ill patients with care, comfort and counseling in the final stages of their illnesses.  In addition to palliative medical treatment, Hosparus provides emotional and spiritual support for patients and their families.  Dr. Stewart's acquaintance thought he might be interested in the position given his educational background and interests, and suggested he apply.  He did.

Dr. Stewart first contacted  Dr. Joseph Rotella, Senior Vice President and Chief Medical Officer of Hosparus, and requested that they meet informally to discuss the duties of the job. During that informal meeting, Dr. Stewart volunteered that he had struggled with addiction during the past, but believed he had fully addressed and resolved his problems with substance abuse.  Dr. Stewart also authorized Dr. Rotella to contact Dr. Burns Brady of the Kentucky Physicians Health Foundation, who had treated Dr. Stewart for his addiction to prescription medication.

On April 4, 2007, Dr. Stewart submitted a written application for the position.  As part of that application, he consented to a background check, affirmed that there were no misstatements on the application, and affirmed that he did not knowingly withhold "any information that might adversely affect [his] chances for employment."  When asked whether he had ever been convicted of a felony, he answered "no."

On May 2, 2007, Dr. Stewart provided written consent for Hosparus to conduct a background check of him through an outside agency, Abso (which was called AbsoluteHire at

the time, but will be referred to herein as Abso for convenience). A few days later, Ms. Rhonda Craven (the recruitment coordinator for Hosparus) placed a background check request via Abso's online system.

In the meantime, Dr. Rotella began his own background investigation, first by contacting Dr. Stewart's two listed references and taking notes of his conversations with them on May 3, and then by visiting the Kentucky Board of Medical Licensure on May 9, where he obtained the publicly available records from 1999 to 2004 regarding the suspension, restoration with restrictions, and final reinstatement of Dr. Stewart's medial license. These records do not include the specific criminal charges against Dr. Stewart, but do include a list of facts regarding the criminal investigation to which Dr. Stewart stipulated, including his admissions that (1) he had been stopped by the DEA and found in possession of an unlabeled vial of Percocet, Xanax and Lortab, (2) that he was addicted to a narcotic pain medication, that he had engaged in prescription-splitting of pain medication with his patients for an extended period of time, (3) that he signed blank prescriptions for his nurse to use in writing prescriptions for controlled substances in his absence, and (4) that he had been treated for chemical dependency twenty-five years ago (at the time) and relapsed after twelve years. Dr. Rotella then wrote to Dr. Brady (who had treated Dr. Stewart's addiction to prescription drugs) on May 9, but Dr. Brady did not respond.

Dr. Stewart's first reference, Dr. Katherine Johnson (not a medical doctor), who was his advisor at the Presbyterian Seminary, described him as "thoughtful, self-aware, open to others, respectful, and kind." She also noted that he was "empathetic" and "would not mirror or amplify stress [or] anger in others." She stated that, in her opinion, he had no major limitations, and that

his strengths were his "spiritual commitment, self-awareness, and growth that have come from overcoming difficulties in life." When asked whether she had any hesitation about recommending Dr. Stewart for employment with Hosparus, she answered "no," noting that "he's a fine person" and that he "would be an excellent fit for hospice" and "would work well with the team." In spite of Hosparus's dual function of medical and spiritual/emotional care, Dr. Rotella stated that he did not find Dr. Johnson's recommendation to be particularly helpful because she was not a medical doctor.

Dr. Stewart's other reference, Dr. Warren Bilkey (a medical doctor), with whom Dr. Stewart had interned in the specialty of pain management and rehabilitation, and with whom he had been in private practice during his most recent bout of addiction, also spoke highly of him. Noting that he knew Dr. Stewart very well and had worked closely with him, Dr. Bilkey stated that he had a "great bedside manner," that "patients like him," and that he "works well with [a] team (usual rehab model)." Dr. Bilkey described Dr. Stewart as warm, amiable, empathetic, honest, mature, and a team player, and noted that his major strengths were, in addition to his great bedside manner, his "long experience with pain management and physical medicine." When asked about Dr. Stewart's major limitations, Dr. Bilkey asked what level of primary medical care would be required, because "in PMR [pain management and rehabilitation] we are comfortable with general medical management, but consult specialists for problems." After Dr. Rotella described a typical Hosparus patient, however, Dr. Bilkey said "he'll be fine," and, when asked whether he had any hesitation recommending Dr. Stewart for employment at Hosparus, he said "no" and gave him his "top recommendation." In spite of being in private practice with Dr. Stewart during the time he battled an addiction to prescription medication and surrendered his

license, however, Dr. Bilkey responded "none" when asked whether there was anything else he felt was important for Hosparus to be aware of in its consideration and selection process.

*The Interview*

Dr. Stewart's formal interview with Hosparus took place a little over a week later, on Friday, May 11, 2007. The interview was conducted in two steps. He first met with Marcia Johnson (vice president of human resources for Hosparus), individually, for thirty minutes, and then with Dr. Rotella, Judy Glidewell (director of quality and compliance for Hosparus), Cassie Mitchell (clinical manager of Baptist Hospital Northeast), and Dr. Bill Stodghill (assistant medical director for Hosparus) for an hour in a team format. The parties' opinions of the interviews are widely divergent.

According to Dr. Stewart, he left the team interview fully expecting that a job offer would follow, because he was uniquely and amply qualified for the job in terms of education and experience, because he is well spoken, well groomed, and has excellent communication skills, because he observed frequent nods of approval regarding his responses to the team's questions, and because Dr. Rotella patted him on the back as he was leaving and remarked, "it looks good." Dr. Rotella admits he likely patted Dr. Stewart on the back as he was leaving, because that is his custom, but denies telling him "it looks good."

After the interview concluded, the team discussed Dr. Stewart's candidacy among themselves. There is no evidence to support the belief that anyone would have recommended hiring him at that time. In fact, the interview reports, which supposedly reflect the team

members' contemporaneous evaluation,[3] but were not all signed and submitted contemporaneously, are not favorable. Although the reports introduced in evidence indicate that the group agreed that Dr. Stewart's professional appearance was good, the interviewers felt that he merely met the standards or was unacceptable with respect to the other areas of concern. Their general consensus was that he lacked career focus, did not communicate well during the interview (specifically that he seemed nervous and was awkward). Although each had specific comments regarding why, several of which overlapped in substance, the Hosparaus defendants assert that they all agreed in their post-interview discussion that Dr. Stewart was not a good fit for the position.[4]

*The Reports Prepared by Abso*

After the group discussion, Ms. Craven brought Abso's report of its background check of Dr. Stewart to Ms. Johnson, and the two women reviewed it with Dr. Rotella. Although Abso collected its information directly from the Kentucky Administrative Office of the Courts, the state-wide repository for criminal records, its first report incorrectly indicated that Dr. Stewart had been convicted of a felony of possessing prescription controlled substances not stored in their original container,[5] which caused Ms. Johnson to believe that Dr. Stewart had lied on his

---

[3]Dr. Rotella, for example, signed and dated his May 22. Ms. Johnson signed and dated hers May 11, but added comments after that date. Ms. Glidewell signed and dated hers May 11, 2007. Ms. Mitchell dated hers May 11, 2007, but did not sign it. Dr. Stodgill did not submit a report.

[4]Dr. Stwart belatedly sought to depose those meeting participants, but only after the extended discovery deadline had passed, and after the defendants filed motions for summary judgment.

[5] The report listed the case number (00-F-000187), the type of charge (felony), the "final charge" ("controlled substance prescription not in original container"), the disposition ("guilty (conviction)"), and the disposition date (3/9/2000). The conviction is listed under the original case number, which included a felony charge. Possessing controlled substances not stored in their original containers is a misdemeanor, not a felony, however, but one would have to look up the specific statutes to know that. Moreover, the case also originally included three additional misdemeanor charges, and Dr. Stewart appears to have pled

continue...

application, and prompted Dr. Rotella to call Dr. Stewart very shortly thereafter. Dr. Stewart

informed Dr. Rotella then that the report was in error, and followed up days later (on

Wednesday, May 16), by hand-delivering a copy of the docket form regarding his criminal

prosecution, a recent FBI background check of him, and a background check from another

service (Intellius), none of which indicated (correctly) that Dr. Stewart had been convicted of a

first-degree felony drug crime in 1999.

Later that same day, Ms. Craven requested that Abso begin the so-called "adverse action

process" required pursuant to the Fair Credit Reporting Act, so that Dr. Stewart would receive

the notices of a likely or impending adverse employment action that are required by the Act.

The next day, Abso generated a pre-adverse action notice, and sent the notice along with a copy

of the report it sent to Hosparus, to Dr. Stewart.

Once Dr. Stewart received the notice and report, he promptly called Abso to dispute the

listing of a felony conviction. Abso immediately responded by doing two things. It first

contacted Ms. Craven at Hosparus and told her that the first report was being contested, so they

should delay any final adverse employment action until Abso's follow up investigation was

complete. It then immediately[6] called the Jefferson County Circuit Court (the court in the county

where Dr. Stewart entered his guilty plea and the original repository for his records), and was

told he had originally been charged with a felony, but that his felony charge was amended to a

---

[5]...continue
guilty on March 9, 2000, to one of them – third degree possession of controlled substance (first offense) –
not the charge listed in the report.

[6]Abso attempted to clarify its report within seven minutes after receiving Dr. Stewart's call, and
actually spoke with someone at the Jefferson Circuit Court within twelve minutes.

misdemeanor charge on February 6, 2004. That was not entirely correct,[7] but, based solely on that conversation, Abso promptly revised its report to note prominently that it had been updated on May 21, 2007, and to state "CASE WAS AMENDED TO A MISDEMEANOR ON 2/6/04." Abso also changed the listing of case type to "misdemeanor," but left the remaining listing unchanged, and sent a revised report to Hosparus.[8] Based on the docket notations contained in the case report sent from the Administrative Office of Kentucky's courts, the explanation given to Abso when it called the Jefferson Circuit Court may not be fully correct about which of the original charges was amended, but it does accurately reflect that Dr. Stewart's conviction ultimately was only for a misdemeanor, not a felony, and correctly identifies the final misdemeanor charge.[9]

The next day, Ms. Craven accessed the revised report from the online system and shared

---

[7]The record provided by the Kentucky Administrative Office of the Courts indicates that Dr. Stewart was, in fact, originally charged with a felony, but not the felony of possessing prescribed controlled substances not stored in their original container, as that offense is only a misdemeanor, *see* Ky. Rev. Stat. 218A.210. Instead, in return for the dismissal of the felony charge and two other misdemeanor charges, Dr. Stewart appears to have pled guilty to the charge of possession of controlled substances in the third degree, which *could* be a felony charge, but was not a felony charge against *him*, because it was his first offense, *see* Ky. Rev. Stat. 218A.1417. His plea to that particular misdemeanor possession charge appears to have been later set aside, on March 6, 2004, however, in favor of entry of a guilty plea to a different misdemeanor not originally charged, specifically the charge of possessing prescription controlled substances not stored in their original container.

[8]Abso sent its revised report to Hosparus less than seventy minutes after receiving Dr. Stewart's call.

[9]A as noted in footnote 7, *supra*, a review of the memo notation in the list of records sent to Abso by the Administrative Office of Kentucky's courts indicates that Dr. Stewart's original guilty plea to one of the three misdemeanors with which he was charged appears to have been set aside and amended on February 6, 2004, to a guilty plea for *different* misdemeanor that was not originally charged, but could have been, based on the underlying facts. Thus, to the extent that the text of Abso's revised report states that a former felony charge or conviction was amended to a misdemeanor conviction in 2004, it appears to be partially incorrect. Based on the evidence before the court, however, the court cannot verify how or why the amendment occurred, or why it might have occurred four years after Dr. Stewart first was charged, and Dr. Stewart has not provided the court with original documents pertaining to his criminal case.

it with Ms. Johnson, who in turn shared it with Dr. Rotella.  According to their affidavits, they made a final decision at that time not to hire Dr. Stewart solely on the basis of his interview.  The day after that, Ms. Johnson called Dr. Stewart to inform him that he would not be offered the job, and, the day after that, on May 24, 2007, Abso generated a final adverse action letter to Dr. Stewart.

*Subsequent Events and the Commencement of this Litigation*

Dr. Stewart continued to pursue other employment opportunities, successfully.  In November 2007, a little over five months after he lost the Hosparus opportunity, Dr. Stewart was hired by the Department of Veterans Affairs in Lexington, Kentucky, for a significantly higher (*i.e.,* $65,000 to $75,000 higher) salary than he would have enjoyed at Hosparus, which might have been a short-lived salary anyway, as the inpatient unit at Baptist Northeast closed in November 2008.

In May 2008, Dr. Stewart filed suit in state court against Abso, Ms. Craven (whom he appears to have mistakenly believed was an employee of Abso), Hosparus, and Dr. Rotella.  The complaint, drafted in a minimal notice pleading style permitted by both the Kentucky and Federal rules of civil procedure, alleged violations of the Fair Credit Reporting Act, and asserts two state law cause of action:  a defamation claim against all defendants, and a wrongful interference with business expectation claim against only Abso and Ms. Craven (presumably because Dr. Stewart was under the misimpression that she was an employee of Abso). It also seeks punitive damages. Abso promptly removed the case to federal court.

The parties met on July 3, 2008, as required by Fed. R. Civ. P. 26.  Although the parties exchanged initial information required by the rule, including the names and titles of potential

witnesses, copies of the interview reports and other records in Abso's and the Hosparus defendants' possession, and although the defendants proceeded with deposition practice, Dr. Stewart appears to have conducted little to no significant discovery on his own, in spite of being afforded additional time to do so by agreement of all counsel and an order of the court. Specifically, it appears that he took no depositions, and there is nothing in the record that indicates he conducted any meaningful written discovery or any detailed review of the defendants' records beyond their initial disclosures.

*The Defendants' Motions for Summary Judgment*

At the close of the extended discovery period, the defendants filed motions for summary judgment. Abso, the only defendant clearly identified as the subject of alleged violations of all three potential causes of action (a violation of the Fair Credit Reporting Act, defamation, and wrongful interference with a business expectation) filed its own motion.[10] The Hosparus defendants (Hosparus, Ms. Craven, and Dr. Rotella) jointly filed a separate motion.[11] Out of what appears to be an abundance of caution, given notice pleading standards, rather than necessity (as the court reads the complaint), the Hosparus defendants asserted that they were entitled to summary judgment in their favor, even with respect to those claims not explicitly made against them (*i.e.,* violations of the Fair Credit Reporting Act and wrongful interference with a business expectation).[12]

---

[10]Docket no. 24.

[11]Docket no. 25.

[12]Dr. Stewart did assert a claim of wrongful interference with a business expectation against Ms. Craven, but (as noted *supra*) he appears to have done so because he was under the mistaken impression that she was an employee of Abso, not Hosparus, Dr. Stewart's potential employer. *See* Complaint at ¶ 4 and Pl's Initial Disclosures at 2 (docket no. 15).

In response, Dr. Stewart filed a motion asking for a settlement conference and for additional time to respond to the defendants' motions for summary judgment.[13]  The defendants agreed to the requested extension of time, but when Dr. Stewart then concurrently filed a single response to both their motions,[14] and a motion for additional time to take discovery,[15] they energetically opposed that request.

The court denied the motion requesting additional time for discovery.[16]  The court did not doubt that Dr. Stewart suffered significant health complications during the latter part of the discovery period, but his counsel never informed the court of them during the discovery period, or requested a further extension of time as the first extension of time and dispositive motions deadline approached.  Instead, he waited until the defendants filed motions for summary judgment, and then filed a motion requesting additional discovery to respond to them.  In support of that motion, however, Dr. Stewart produced no evidence that he had diligently engaged in any discovery efforts that did not require the active participation of his client, or that any meaningful discovery he attempted to conduct had been thwarted by the defendants.  More importantly, many of the affiants, and the critical documents (e.g., interview reports, the records Abso obtained from the Kentucky Administrative Office of the Courts) referenced in the defendants' summary judgment motions were known to plaintiff and his counsel.  Some, such as Ms. Quillen, whose lunch table conversation with Mrs. Stewart putatively supports Dr. Stewart's defamation claim, were known to be witnesses of interest principally by plaintiff and his counsel.

---

[13]Docket no. 26.

[14]Docket no. 30.

[15]Docket no. 31.

[16]Docket no. 44.

Dr. Stewart never adequately explained why he and his counsel had not taken steps to depose the witnesses, or question the parties about the key documents at issue, in the several months that preceded his health problems. Rather, it appeared to be the case (as he alluded it his motion for a settlement conference) that his strategy was to efficiently husband his resources by waiting until he knew precisely what the defenses were, seek a settlement conference, and then conduct only the limited discovery necessary withstand a summary judgment. That strategy, in addition to being procedurally unfair, is impermissible.

As a result, however, Dr. Stewart appears to be left with little more than his uncorroborated allegations, his somewhat lengthy affidavit, and his wife's very brief affidavit, and discovery he produced *to* defendants to support his response to the defendants' motions. In addition, although he filed a joint response to the defendants' separate motions, and states that he "disagrees with the facts as they are set out by the Defendants in their respective motions for summary judgment" and asks the court to deny the Defendants' respective motions,[17] he responds specifically only to all of Abso's arguments. With respect to the remaining defendants' arguments, Dr. Stewart largely ignores them, except for a passing assertion that he "could show, that Defendant Hosparus, through its employees published the faulty information it received from the Defendant ABSO [*sic*] to others." He makes no mention of Defendants' assertions regarding the putative wrongful interference with a business expectation claim against them.

The court will now evaluate which, if any, of Dr. Stewarts' claims survive summary judgment.

---

[17] Pl's Resp. to Defs.' Mot. for Summ. J. at 2 and 25.

## II.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Accordingly, only facts that are both disputed (actively contested) and material (those "that might affect the outcome of the suit under the governing law") will defeat summary judgment. *Id.* at 248. Once the movant has met its burden, the nonmoving party cannot rely on conclusory or self-serving allegations, but "must present significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 340 (6th Cir.1993); *see also* Fed. R. Civ. P. 56(e)(2)[18] and *Scott v. Harris,* 550 U.S. 372, 380 (2007). Given the relative dearth of Dr. Stewart's discovery, these standards might prove insurmountable for Dr. Stewart, but the court is mindful that it must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

---

[18]That subsection of the rule states: "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial."

## III.

The court has reviewed the record carefully, and in the light most favorable to Dr.

Stewart, and notes that Dr. Stewart has made no legal arguments in opposition to those raised in

the Hosparus defendants' motion for summary judgment. He ignores completely the Hosparus

defendants' assumptions that he was seeking recovery from them pursuant to the Fair Credit

Reporting Act and under the tort of wrongful interference with a prospective business

expectation – neither of which was clear from the face of the complaint – and for punitive

damages. He cites no law in opposition to these Hosparus arguments and does not direct the

court's attention to any specific challenge to the factual lynchpins of the Hosparus defendants'

arguments regarding those possible claims.

Although Dr. Stewart's response clearly states that it is the responsive document to both

pending motions for summary judgment, the focus of his analysis is almost exclusively on the

arguments presented in Abso's motion. The only of his putative claims against the Hosparus

defendants to which he makes even passing reference, is his allegation of defamation. With

respect to their motion for summary judgment of that claim, he does no more than misstate the

type of motion at issue and aver that he can prove, with additional discovery not taken in the

time previously permitted and extended by the court, that the Hosparus defendants disseminated

defamatory information about Dr. Stewart:

> The Plaintiff can show, with further discovery, that the Defendant
> Hosparus, through its employees published the faulty information it
> received from the Defendant ABSO [*sic*] to others. Plaintiff has not
> had the opportunity to depose Dr. Rotella and other Hosparus
> employees regarding the dissemination of the inaccurate reports. The
> allegations presented by the counsel for the Defendant Hosparus and
> the individual Defendants are not sufficient to succeed on a motion
> to dismiss [*sic*]. The Plaintiff believes that the faulty criminal

> background reports were published by said Defendants, and the
> Plaintiff will prove dissemination with additional discovery.

Pl's Resp. to Defs' Mot. Summ. J. at 18. Significantly, Dr. Stewart does not address or refute the Hosparus defendants' factual or legal analysis of another necessary element of a defamation claim – injury to reputation. Without proof of that element, though, the entire claim fails, regardless of whether dissemination is (or could be) established.

Dr. Stewart does not expressly state that he is abandoning certain arguments or claims in his response, but his failure to address the Hosparus defendants' arguments is certainly tantamount to that. Although his recitation of certain facts is different in places than the Hosparus defendants', that alone is not enough. "The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479-80 (6th Cir.1989). "The nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris,* 260 F.3d 654, 665 (6th Cir.2001).

Dr. Stewart is not a *pro se* plaintiff for whom this court must liberally construe his pleadings; he is represented by highly experienced and knowledgeable counsel. By his silence after an extended period to prepare a response, Dr. Stewart has failed to meet his burden of establishing that summary judgment is not appropriate. This court will therefore grant the Hosparus defendants' motion and dismiss all claims against them.

## IV.

With respect to Abso's arguments, Dr. Stewart is not silent. He addresses their arguments with both case law and proffered facts. The court will now evaluate each in turn.

-17-

*The Fair Credit Reporting Act*

The court will first evaluate Dr. Stewart's claim that Abso violated the Fair Credit Reporting Act.

The purpose of the Fair Credit Reporting Act is to require that "consumer reporting agencies [such as Abso] adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information...." 15 U.S.C. § 1681(b). A consumer reporting agency may furnish a consumer report to a third party that intends to use the information for employment purposes, 15 U.S.C. § 1681b(a)(3), but must "follow *reasonable procedures* to assure *maximum* possible accuracy of the information concerning the individual about whom the report relates," 15 U.S.C. § 1681e(b)(emphasis added).

A plaintiff alleging a violation under the Fair Credit Reporting Act must, at a minimum, present evidence tending to show that a credit reporting agency prepared a report containing inaccurate information, but inaccuracy alone is not enough to carry the day, because "[t]his section does not impose strict liability for inaccurate entries in consumer reports; the preparer is held only to a duty of reasonable care." *Spence v. TRW, Inc.*, 92 F.3d 380, 382 (6th Cir. 1996).

The Federal Trade Commission, the agency charged with implementing the regulations promulgated pursuant to the Fair Credit Reporting Act, has stated that a consumer reporting agency "does not violate this section simply by reporting an item of information that turns out to

be inaccurate." 16 C.F.R. Pt. 600 App.  Rather, it has declared:

> Whether a consumer reporting agency may rely on the accuracy of information from a source depends on the circumstances. This section does not hold a consumer reporting agency responsible where an item of information that it receives from a source that it reasonably believes to be reputable appears credible on its face, and is transcribed, stored and communicated as provided by that source. Requirements are more stringent where the information furnished appears implausible or inconsistent, or where procedures for furnishing it seem likely to result in inaccuracies, or where the consumer reporting agency has had numerous problems regarding information from a particular source.

*Id.*  Yet, the Sixth Circuit stated, "we hold that a consumer reporting agency does not necessarily comply with [Section 1681e(b) ] by simply reporting in an accurate manner the information it receives from creditors." *Bryant v. TRW, Inc.,* 689 F.2d 72, 78 (1982). The court noted that, under the plain language of the statute, liability requires a finding that the agency failed to follow reasonable procedures to assure "maximum possible accuracy" of the information it reports about a consumer.  *Id.*

Courts, including those within the Eastern and Western Districts of Kentucky, typically hold that the issue of whether the agency failed to follow reasonable procedures will be a jury question, unless the reasonableness or unreasonableness of the procedures is beyond question. *See, e.g., Bryant v. TRW, Inc.,* 487 F.Supp. 1234, 1242 (E.D.Mich.1980), *aff'd,* 689 F.2d 72 (6th Cir.1982).   This court finds persuasive, however, the reasoning articulated in one such case from outside the Sixth Circuit, *Henson v. CSC Credit Services,* 29 F.3d 280 (7th Cir. 1994), in which the Seventh Circuit upheld the dismissal of claims pursuant to the Fair Credit Reporting Act.

In *Henson,* a state court clerk erroneously noted in a judgment docket that a money judgment had been entered against Mr. Henson. Two credit reporting agencies relied on the judgment docket notation and indicated its existence in Mr. Henson's credit reports. Thus, while

the credit reporting agencies' description of the contents of the judgment docket was accurate, the notation correctly transcribed by credit reporting agencies was not.

The district court dismissed Mr. Henson's claims under the Fair Credit Reporting Act, and the Seventh Circuit affirmed that decision. In so doing, the Seventh Circuit held, as a matter of law, that a credit reporting agency is not liable under the Fair Credit Reporting Act for correctly reporting inaccurate information obtained from a court's judgment docket, a "presumptively reliable source," absent prior notice from the consumer that the information might be inaccurate.

In this matter it is beyond question that Abso did *not* rely on an official court record, as did the *Henson* defendants, because the report generated by the Kentucky Administrative Office of the Courts indicates that it is not an official court record in bold type. Nevertheless, the Kentucky Administrative Office of the Courts, which generated the report, is the state-wide repository of official court records from courts throughout this Commonwealth and was, in Abso's experience, a "presumptively reliable source" from which they had not previously received inaccurate reports.[19]

---

[19]While not fully resolving the issue of the reasonableness of using summary reports rather than examining original criminal case records, the court makes some observations concerning the use of criminal background information in federal court. The federal district court frequently considers a defendant's criminal history in at least two highly significant circumstances: the decision whether to grant bail, and sentencing. The United States Probation Office routinely prepares pretrial service reports and presentence reports, each of which contains very detailed information concerning a defendant's criminal background, yet they rely almost exclusively on summary information from online sources – not the examination of original records. Personal liberty turns on the accuracy of such information. A decision to deny bail can result in the pretrial detention of a defendant for a matter of months, and occasionally longer. A defendant's criminal history, of course, is a major factor in determining a guideline sentence range. While original records might be reviewed very occasionally in the case of a heavily contested criminal history, the summaries from National Criminal Investigation Center are the standard source of information for these significant determinations.

The document received from the Kentucky Administrative Office of the Courts listed the case number originally assigned to Mr. Stewart's prosecution, and the list of four charges originally brought against him, including three that were dismissed, and one that was subsequently amended. The list of charges, which pertained to the possession of controlled substances, did not include any charge-specific designation of felony or misdemeanor, nor did it include the relevant statute for each charge, but the case number that remained with the file bore an "F" (for felony) identifier. The first listed charge was, in fact, a felony. The second (which was later amended) can be either a felony or misdemeanor, depending on the defendant's criminal history, and the third and fourth were only misdemeanors, but, again, there was no indication of any of this information on the record. Instead, it indicated only a "GUILTY" designation with respect to the amended second charge, which had been changed to "controlled substance prescription not in orig container 1st." The docket number, bearing the felony identifier, however, had not been renumbered or relettered to reflect the ultimate disposition of the case. Accordingly, after consulting the Kentucky Circuit Court Clerks' manual to interpret the "F" identifier, Abso reported that Dr. Stewart had been convicted of a felony, and that the final charge was to "controlled substance prescription not in orig container 1st." That charge is not a felony, however.

After receiving notice from Dr. Stewart that the report was in error because he had never been convicted of a felony, Abso, with remarkable speed, investigated, amended, and re-issued the report. Their investigation consisted of calling directly the Jefferson Circuit Court and inquiring about the status and ultimate disposition of the charges against Dr. Stewart, however. During that conversation, Abso's representative was told that the case had been "amended to a

misdemeanor."  Unbeknownst to Abso, this was not entirely correct.

The original charge two, which bears an "amended" notation could, as noted above, be prosecuted as a felony or a misdemeanor.  Other than the "1st offense" designation, there is nothing in the record prepared by the Kentucky Administrative Office of the Courts that would indicate the degree of seriousness of the charge.  Nevertheless, although Dr. Stewart's original charge was in fact amended, and he ultimately was convicted (a guilty plea is a conviction) of only a misdemeanor, it is not entirely correct to say, as Abso did on the revised report, that the case was "amended to a misdemeanor."  Instead, it appears that the rather serious sounding misdemeanor charge to which he originally pled guilty (possession of controlled substances, 3rd degree) was itself  amended years later to a less serious sounding misdemeanor charge (controlled substance prescription not in original container).  To know what, exactly, happened would require this court to go beyond the face of the report from the Kentucky Administrative Office of the Courts and review the original, underlying court documents, and that is precisely what Dr. Stewart asserts that Abso should have done to be compliant with the mandates of the Fair Credit Reporting Act.

As the Seventh Circuit noted in *Henson*, however:

> [R]equir[ing] credit reporting agencies to go beyond the face of numerous court records [from presumptively reliable sources] to determine whether they correctly report the outcome of the underlying action ... would also require credit reporting agencies to engage in background research which would substantially increase the cost of their services. In turn, they would be forced to pass on the increased costs to their customers and ultimately to the individual consumer.

*Henson,* 29 F.3d at 285.  Consequently, the Seventh Circuit determined that any interpretation of the Fair Credit Reporting Act that would:

-22-

> [r]equir[e] credit reporting agencies to look beyond the face of every court document to find the rare case when a document incorrectly reports the result of the underlying action would be unduly burdensome and inefficient. The consumer is in a better position than the credit reporting agency to detect errors appearing in court documents dealing with the consumer's own prior litigation history. Once the information is erroneously reported on the consumer's credit report, the consumer will be alerted to the error and can then seek correction of the error by notifying the credit reporting agency or the court itself. Absent such notice, however, the credit reporting agency may rely on the accuracy of public court documents in preparing a credit report without being subject to liability under the FCRA.

*Id.* at 285-86. As noted previously, this court finds the Seventh Circuit's reasoning to be sensible, persuasive, and in accordance with both the text of the statute and commentary to the applicable regulation. This court would therefore follow that reasoning, if necessary. Because Dr. Stewart has not proffered sufficient facts to satisfy his burden of establishing a disputed issue of fact with respect to another element of his Fair Credit Reporting Act claim, however, this court need not make a definitive determination regarding whether Abso's procedures were reasonably sufficient to assure maximum possible accuracy.

To sustain a claim of a negligent[20] violation of section 1681e(b), a consumer must show also show that he suffered an injury that was caused by the inclusion of inaccurate information in the consumer's report. *See* 15 U.S.C. §1681o. This Dr. Stewart has not done.

---

[20]No proof of injury is required for willful violations of § 1681. *See Beaudry v. TeleCheck Services, Inc.*, 579 F.3d 702 (6th Cir. 2009). Dr. Stewart does not, in his complaint, make precise statutory references (to either 15 U.S.C. §1681n or §1681o) that would permit the court to easily determine the exact parameters of his claim. Nonetheless, a claim for negligent violation (purusant to §1681o) reasonably may be inferred from the manner in which Dr. Stewart responded to Abso's motion for summary judgment. The *Beaudry* opinion was entered August 28, 2009. Dr. Stewart did not file his response until January 7, 2010. Nowhere in that response does he assert that he need not show that Abso's actions proximately caused him to lose his potential job. Instead, he concedes that he must establish actual damages proximately caused by Abso's actions (*see* Pl.'s Resp. at 15) and otherwise practices the case as if recovery were sought exclusively under § 1681o (*see generally* Pl's Resp. at 10-17).

There is no credible evidence in the record that suggests the report was anything more than an additional, cumulative justification for Hosparus's decision not to offer Dr. Stewart the job. Before he received the Abso report, Dr. Rotella knew, from conversations with Dr. Stewart, that he had suffered from addiction and relapse, on what appeared to be a twelve to thirteen year cycle, and that his application for employment with a palliative care unit (for which the use of narcotic pain medication is a significant component of the practice) was approximately seven and one-half years after his last relapse. He knew, from reviewing publicly available records from the Kentucky Board of Medical Licensure, that Dr. Stewart's most recent relapse involved addiction to narcotics, prescription splitting, signing blank prescriptions for his nurse to use in his absence, and an investigation by the DEA, who found controlled substances in an unlabeled container when they stopped him. Consequently, although Dr. Rotella may not have known whether and, if so, with *which* crimes Dr. Stewart was charged before he received the Abso report, he had detailed knowledge that Dr. Stewart had admitted to facts that could support any number of serious criminal charges against him.

Although Ms. Johnson, another member of the team who interviewed Dr. Stewart, candidly admitted that she perceived the first Abso report as indicating that Dr. Stewart lied on his application, she did not receive the report until after the interview team met and discussed the interview. There is no evidence that she, or any other member of the interview team had decided to hire Dr. Stewart, or advocated that he be hired, before she received the report. In fact, the available evidence indicates just the opposite. The evidence available to the court therefore indicates that the team had already decided to keep looking and, at worst, the incorrect report may have merely supported the decision they had already made. Regardless, the report was

promptly amended and, although, it too was not fully accurate, it did indicate that the ultimate charge against him was only a misdemeanor. The court concludes that there is no question worthy of a jury's consideration that Dr. Stewart did not lose the employment opportunity with Hosparus because of the Abso report, but because, for whatever reason, he did not interview well enough to suit the team that evaluated him and determined immediately after the interview that he was not a good fit for the job. The court will therefore enter summary judgment in Abso's favor on this claim.

*Defamation*

Dr. Stewart also asserts a claim for defamation against Abso. In Kentucky, the elements of a cause of action for defamation are: (1) defamatory language, (2) about the plaintiff, (3) that is published, and (4) thereby causes injury to plaintiff's reputation. *Stringer v. Wal-Mart Stores, nc.,* 151 S.W.3d 781, 793 (2004). Accepting as true that the statements regarding Dr. Stewart's criminal history were defamatory, and acknowledging that they undeniably were about him, he has not presented the court with sufficient evidence with respect to the other elements of the claim to withstand summary judgment.

The court will address the last element first. Plaintiff has not provided the court with sufficient evidence to create a question of fact regarding whether Abso's reports caused injury to his reputation. To begin with, Abso undeniably transmitted its reports to another company (Hosparus), but there is no evidence that Abso transmitted the report or the contents of the criminal history section to any person other than Ms. Craven, the designated recipient at Hosparus. And, Hosparus, through its employee and agent, Dr. Rotella, was already well aware of information regarding Dr. Rotella's criminal history that was far more detailed than the brief notation in the Abso

report.

It would strain credulity to suggest that the information that Dr. Rotella gleaned from the publicly available records from the Kentucky Board of Medical Licensure, which pertained to the same criminal investigation of Dr. Stewart, was *less* damning than a felony (as opposed to a misdemeanor) charge of storing prescription medication in something other than its original container. For, from those published reports, Dr. Rotella (and thereby Hosparus) learned that Dr. Stewart was an addict, prone to relapse, who lost his medical license because he became addicted to narcotic pain medication, was stopped by the DEA while in possession of an unlabeled vial of three controlled substances, and *admitted* that he had engaged in prescription-splitting with his pain patients for an extended period of time and left blank scripts for his nurse to use to dispense narcotics. He also learned that Dr. Stewart's license was not fully restored to him for several years, and not until he successfully completed treatment, and underwent required personal and family counseling. The criminal activities to which Dr. Stewart admitted, then, are far more serious than the charge to which he ultimately pled, regardless of whether it was labeled a felony or misdemeanor.

In addition, there is no evidence to support Dr. Stewart's other theory of injury to his reputation that supposedly resulted from Abso's publication of its report. Specifically, Dr. Stewart argues that the community's knowledge that he lost the Hosparus job, in whole or in part because of the criminal report prepared by Abso, injured his reputation. Yet, there is no evidence that Abso published information about that loss. Rather, the evidence clearly establishes that Dr. Stewart did, by sharing what happened with concerned or inquisitive acquaintances.

Dr. Stewart's wife filed a brief affidavit that a current or former Abso employee remarked

"Oh, was that your husband?" when Mrs. Stewart shared in a social setting that her husband had been denied a job because of an inaccurate criminal history report prepared by Abso. This statement, however, is not enough to support Dr. Stewart's claim. Assuming that the declarant was, in fact, a current employee of Abso at the time the statement was uttered, at most the statement was merely responsive to information already shared and too non-specific. The statement also suggests that Ms. Stewart's acquaintance did not know the identity of the subject of the report.

Even if Dr. Stewart could establish there exists a question of material fact with respect to the elements of defamation under the common law, he cannot overcome the hurdle presented by the Fair Credit Reporting Act, which he concedes precludes a viable action for defamation against Abso, unless he can establish that Abso acted with malice or willful intent to injure him. Section 1681h(e) of the Fair Credit Reporting Act provides, in pertinent part:

> [N]o consumer may bring any action or proceeding in the nature of defamation .. with respect to the reporting of information against any consumer reporting agency ... based on information disclosed by a user of a consumer report to ... a consumer against whom the user has taken adverse action, based in whole or in part on the report except as false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e). Dr. Stewart does not argue that Abso published the report because it wilfully intended to injure him. Instead, he asserts that Abso acted with malice, in the sense that it published false statements it its report with reckless disregard for the statements' truth or falsity. Although § 1681h(e) does not define the term malice, Dr. Stewart's proffered definition is not inappropriate. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 280 (1964) (defining actual malice in a defamation context as making a statement "with knowledge that it was false or with reckless disregard of whether it was false or not"). Yet, nowhere does he allege that Abso

knew the information it provided to Abso was false. He alleges that Abso did not do all that he believes was necessary to accurately interpret the information it received from the Kentucky Administrative Office of the Courts, but has provided the court with no evidence that establishes Abso sent his first or revised reports to Hosparus with "*reckless* disregard for the truth or falsity" of the statements contained in the report.

Accordingly, for the foregoing reasons, the court finds that Abso is entitled to summary judgment in its favor with respect to Dr. Stewart's defamation claim.

### Wrongful Interference with Prospective Business Expectation

Dr. Stewart's last claim against Abso is for wrongful interference with a prospective business expectation. In *National Coll. Athletic Ass'n v. Hornung,* 754 S.W.2d 855 (Ky.1988), as recognized by the Western District of Kentucky in *CMI v. Intoximeters*, 918 F. Supp. 1068, 1080 (W.D. Ky. 1995), the Supreme Court of Kentucky set forth the principles governing the tort of wrongful interference with a prospective business expectation, and determined that Sections 766B, 767 and 773 of the Restatement (Second) of Torts reflect the prevailing law in Kentucky. To recover under this cause of action, Dr. Stewart must prove the following elements: (1) the existence of a valid business relationship or its expectancy; (2) a defendant's knowledge thereof; (3) an intentional act of interference; (4) an improper motive; (5) causation; and (6) special damages. *CMI*, 918 F. Supp. at 1080 (interpreting *Hornung* and the Restatement (Second) of Torts sections adopted therein).

With respect to those elements, two are not in dispute. Abso certainly knew that Dr. Stewart was applying for employment with Hosparus, that was why they had been asked to prepare the report. In addition, the loss of potential salary constitutes damages. Where Dr.

Stewart has failed to meet his burden of adducing sufficient evidence to withstand summary judgment is with respect to the remaining necessary elements of his claim.

To begin with, Dr. Stewart has not established a valid business expectancy. While all agree that the position for which he applied existed and was theoretically available to him, that is as far as the evidence in his favor goes. Dr. Stewart had not been offered the job either orally or in writing, much less hired on a contingent basis, at the time Dr. Rotella and Ms. Johnson reviewed the first Abso report. He merely interviewed for the position.

While it is human nature to believe oneself uniquely and exceptionally well qualified for an available job, it is a truism that interviewers and job candidates do not always share the same view of how well and interview went. Whether to hire an applicant is rarely based solely on objective information, such as the applicant's résumé,[21] educational background, or work history – much less so after an in-person interview has taken place. Rather, there typically is a significant subjective, and human, component that, at a minimum, affects how the interviewer evaluates the strength of the various components of the interviewee's objective data. That subjective component is undeniably nebulous, as it largely emotional, but it is integral to the process and the candidate's likelihood of success, and cannot be ignored or discounted.

The evidence indicates that the men and women who interviewed Dr. Stewart (before they received the report from Abso), did not share his optimism regarding his employment prospects. Dr. Stewart has presented no evidence (other than his own affidavit) that he had any reasonable basis to believe that, between the conclusion of the interview and the defendants'

---

[21]The court notes, as did the Hosparus defendants, that Dr. Stewart's résumé contained typographical errors and was not formatted in a style that was efficiently and persuasively targeted toward the job he sought, which is curious given Dr. Stewart's graduate degrees and experience in the field of communications.

review of the Abso report, his prospects for employment at Hosparus were good.  He did not depose any of the interview team to determine whether their written reports accurately reflected their post-interview analysis, nor does he have any evidence to confirm that, as Dr. Stewart left, Dr. Rotella actually said "it looks good" to him, or conveyed another, more significant expression that the job was likely his.  Moreover, Dr. Rotella's decision to call Dr. Stewart about the report and to follow up with Dr. Stewart to verify or disprove the statements contained in the report, absent more, simply does not suffice as evidence that an offer of employment to Dr. Stewart would have been forthcoming.  In addition, he admitted during his own testimony, that he hoped for the job and believed that God meant for him to have it, but that no one at Hosparus ever told him that the job was his.  That is not enough to establish a valid business expectancy.

The lack of any proof of the valid business expectancy element of a wrongful interference claim would be sufficient to warrant summary judgment in Abso's favor, but is not the only element of the claim that Dr. Stewart has failed to proof.  For many of the same reasons that he cannot prove a valid business expectancy, he cannot prove causation, either.  In spite of the statutorily inspired or mandated language in the adverse action notices generated by Abso on Hosparus's behalf, which state that the job was not offered to Dr. Stewart, at least in part, on the basis of the contents of the report prepared by Abso, there is no credible evidence that suggests the report was anything more than an additional justification for Hosparus's decision not to offer Dr. Stewart the job.

As noted previously, before he received the Abso report, Dr. Rotella knew, from conversations with Dr. Stewart, that he had suffered repeatedly from addiction and relapse.  He also knew, from publicly available records from the Kentucky Board of Medical Licensure, that

Dr. Stewart's most recent relapse involved addiction to narcotics, and that Dr. Stewart had admitted to facts that could support more than one serious criminal charges against him.

With respect to the motive element, Dr. Stewart alleges reckless disregard for the accuracy of the reports Abso published, but that is not enough. Dr. Stewart must show malice or some significantly wrongful conduct. The court has already determined that Dr. Stewart has shown no evidence of malice, as that term is understood in the context of determining whether a defamation claim is precluded by the Fair Credit Reporting Act. Nor does he have any evidence whatsoever of malice, as that term is commonly understood (*i.e.,* a hostile impulse, or some deep-seated malevolent desire). Malice in this context of this particular claim, however, may be inferred from the mere act of intentional interference without justification, *Hornung*, 754 S.W.2d 855, 859 (Ky. 1988), but Dr. Stewart has established no evidence that would permit an inference of this understanding of "malice" either, though.

Dr. Stewart has adduced no evidence that any employee or agent of Abso was doing anything other than performing the routine duties of her job, much less that an Abso employee intended to interfere with Dr. Stewart's employment prospects. There is nothing in the record to establish that Dr. Stewart had an independent negative relationship with any Abso employee, or to suggest that an Abso employee or agent, for whatever reason, actively tried to sabotage Dr. Stewart's employment chances with Hosparus. Accordingly, this court holds that Abso is entitled to summary judgment of Dr. Stewart's claim of wrongful interference with a business expectation.

**V.**

Dr. Stewart omitted much from his prosecution of this case, and those omissions are

sufficiently grave that there exists no material issue of fact for a jury to try. Dr. Stewart apparently took next to no discovery, and never deposed any of the team of persons, identified early in the case, who made the decision not to hire him – a decision they attribute to legitimate, lawful, and non-tortious factors. He never introduced into evidence the original state records of his conviction, never explained the precise sequence of charges against him, and never described what a fully accurate reporting of his criminal history would be. Indeed, he seems to hang much, if not all, of his case on a bare assertion that Abso erred in its original and revised reports, and has never adequately addressed the issues of causation, liability, or damages. Instead, he has practiced the case almost as if the Fair Credit Reporting Act were a strict liability statute, which it is not.

Accordingly, and for the reasons stated herein, the court will, by separate order grant both motions for summary judgment, dismiss Dr. Stewart's claims against all defendants, and dismiss this action from the court's docket.

DATE:


cc: counsel of record